Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to the law. That says the United States in dishonorable court. Please be seated. Good afternoon, ladies and gentlemen. Welcome to the Fifth Circuit Court of Appeals. We have one case to be submitted today, and we want both attorneys to know how much we appreciate your willingness to be here. We're working on finding ways for the court to be reopened under normal procedures, and this is a big help to us for you to be here so we can work on social distancing and other things. We had successful arguments with another panel. I was on the panel on Tuesday and Wednesday, and that seemed to go well. As I think has been explained to you, the attorneys will use your microphone covers, and you can remove your mask while you're making your arguments, and the judges will remain masked unless we're asking questions or other announcements. Your reward for being here, if there is one, is not only to be able to make a face-to-face presentation on behalf of your clients, but also instead of the normal 20 minutes, we wanted to give you 30 so you have plenty of time to explain your case and answer questions, but you should not feel the least obligated to use the full time because it is more than we would normally allot. With that, we call Cameron County Housing Authority v. City of Port Isabel, and you'll have to tell me whether it's Reamer or Reimer. I'm sure you're asked that all the time. Yes, Your Honor, it's Reamer. Reamer? All right. Reamer. And I've already put my cover on the microphone. Okay, good. Thank you. May it please the Court. Good afternoon, Your Honors. My name is Ben Reamer, and I represent the appellant, the Cameron County Housing Authority, in this matter, which I'll refer to as the Housing Authority. The district court in this case, Your Honors, applied the incorrect legal standard for standing under the Fair Housing Act. The district court disposed of this case on summary judgment based on the holding that the housing authority was required to establish, quote, official action by the city commission in order to proceed with its claims under the Fair Housing Act. However, that is not the law. That has never been the law. There is nothing cited in the district court's opinion establishing that any precedent for that having been the law. There is nothing cited in Appalee's briefing that that should be the proper legal standard in a case such as this, and we have not uncovered any legal precedent setting forth that that would be the appropriate legal standard. And perhaps more importantly, Your Honors, logic dictates that this cannot be the standard, because if this is the standard, the way that this standard was applied in this case, it would completely eviscerate any claims under the Fair Housing Act, because municipalities in situations like this could simply sit back and do nothing and accomplish exactly the harm that the Fair Housing Act prohibits. For multiple reasons, adopting this standard would be a severe diversion, a significant change in the law. So for two reasons, both when we think about this in terms of standing generally and when we look at cases under the Fair Housing Act, it is well settled that inactions, omissions, may give rise to valid claims. And this is specifically set forth in both the court's order and in Appalee's briefing in terms of the standard for standing generally, the Lujan standard. The second prong of the Lujan standard is what we were dismissed on. That is the prong of the standing standards that requires injury in fact, which is fairly traceable to Court Isabel's acts or omissions. And similarly, and more right along the lines of what happened in this case, courts, including the United States Supreme Court in the Huntington case, has recognized that the failure to rezone may constitute a Fair Housing Act violation. I'm going to interrupt you for just one procedural thing. Yes, Your Honor. I just want to be sure, because Judge Ho is with us by telephone, but I just want to be sure that Judge Ho is able to hear everything okay. I am. Thank you. Can you hear me? Yes, you're fine. Thank you. All right. Excuse me for the interruption. Thank you. Go ahead. Thank you, Your Honor. So the court focuses on this, what would be a new and very stringent standard of official action by the city commission, but at the same time acknowledges in the standard part, earlier in the opinion, just setting forth the Lujan standard, that omissions can give rise to valid legal claims, but ignores that when it actually gets to the standard that is applied in this case. Now, even if official action were the standard, Your Honors, there is extensive evidence of official action in this case that were taken to prevent this housing project from moving forward. Before we get into it, I want to ask a question about your legal theory. Suppose that on November 10th, when at this sort of the end of the negotiations, as we're approaching the December 1 deadline, suppose that this mayor and the city manager had come to you and said, you know what, we're approved for four houses, and the third party financier said four houses is going to be good with us too. And so on December, whatever, November 30th, the day before December 1, you close on the four houses, right? And the whole thing goes through, everyone's agreed. Would you have a claim under the Fair Housing Act? Potentially. I mean, what would be the claim? The damages that were caused. If the prior iterations of the plans, because in that instance, Your Honor, funds still would have been lost. A significant amount of those federal funds still would have been lost. At the end of the day, our damage model in this case, which is a nice change, the damage model is pretty straightforward. We were awarded $1.7 million by the federal government. Under that hypothetical, Your Honor, there could still be a potential claim for monetary damages if the same reasons that were pretextual that we believe to whittle the plan down to where it was only four. But I do want to mention one thing, Your Honor. That would not have been possible. The four would not have been possible because we are under a, this property is designated as affordable housing multifamily. When the property was acquired by the housing authority in the early 90s out of the S&L crisis, there's a LURA, a land use restriction. So there has to be a minimum of 10 units on the property. So the four single family, at the end of the day, what the city said was all that they would approve would not have been possible. So if the city had come back and said, we'll prove 10, and the third party financier came back and said, great, we've already, we've already written you prior to your negotiations with the city that will prove 10. Would you have a claim then? I think that's possible. And what would be the case that would support that theory of recovery under the fair housing act? Because the thing I'm struggling with is suppose that the federal government gives you an affordable housing grant for a trillion dollars contingent on city approval, right? But you've got to have a hundred million units. That doesn't mean that your damages model would entitle you to, you know, whatever the trillions of dollars on some wildly speculative thing, because all of the grants are conditioned on the city approval. And so really what you need is some sort of city approval either way, right? And in order to, you're not actually granted the money, you're conditionally granted the money. And your honor, I think the answer to that question is, I don't know. I think that if, if, if, if we had proceeded forward and accomplished the 10 at the end of November, December timeframe, we'd everyone had just agreed and we're going to do the 10 and we had, had received however much the federal government had whittled it down to at that point, the 500,000, would we have a claim? I don't know. I can tell you, I doubt we would be here right now if that had happened, but when the, when the, when the, all the money was gone, then clearly we were damaged. Well, here's the other thing I don't understand is if, if you're telling me that there was some independent legal prohibition on you doing four, why did you ask the third party finance here to approve four and you asked the city to approve four? I mean, you, you went forward in November, your clients, I'm sorry, but the, the, the, I have to assume they didn't realize that the, that the four wasn't going to be allowed. I mean, that at the,   I think they knew that there were not going to be approved to just, I mean, the funds from the federal government are for a multifamily affordable housing project. It is, it got whittled further and further down. I mean, the, the four was four single family homes that were going to be on that site. But as late as November 25th, we're still talking about going forward. So it's not really dead. I mean, the six days before the deadline or five days before the deadline, and we're still trying to get the deal done on the, on the knowledge that the city will approve the four. I think it was, it was desperation. There were, there were federal funds that had been granted. I mean, this is a windfall for a, for a housing authority down in Cameron County that is, is, has a very limited resources. It was trying to provide affordable housing opportunities for the folks down in that community, uh, receiving this grant. And, and, and keep in mind, it's a something that I think gets overlooked a lot in this case is that this had been a multifamily housing project before it was destroyed by a hurricane. And it, it, it was there as at least, I believe it was a 16 unit, uh, complex in 2008 before it was destroyed by the hurricane, by hurricane Dolly. Did that meet the, all the zoning restrictions? So it was, it had been grandfathered in. It was, it was a, uh, it was a multifamily prior to the Cameron County, um, zoning ordinance scheme being put into place. It's whether or not the, the zoning had to be changed at all in this case, uh, I think is questionable. It hadn't been occupied for some number of years. Um, so the folks that were trying to develop it went through the proper process, but it had previously been grandfathered in as a, uh, affordable housing complex before the zoning ordinance was put in place. All right. If there's any further questions, I'll, I'll, I can proceed. We'll let you know. Go ahead. Okay. So back to the, back to the standard that was applied in this, in this case, the, uh, that the city commission did not take official action. Um, when you look at the, at the, the, the, the fairly long complicated history that went on, it's about nine months of, uh, of the housing authority, trying to get this project approved, trying to see this project come to fruition. The city, it was clear throughout was going to block this project and the city did so. But what's critically important to keep in mind for purposes of this appeal is that at every step of the way, when the city blocked this project, it didn't have to do, do so through any proactive measures. It could do so through inaction. The city didn't have to do a single thing to accomplish the goal of blocking this project. You made a statement that it was, it was clear that this, that the city was going to block it. Tell us, tell us what we, and I think you were about to do some of this, but tell us what's in the record step-by-step that we should reasonably read as an indication that the city was just never going to do it. So it, when the funds were first granted, actually there was a prior mayor that said that, uh, that he did support it. And so then the, and so then the administration changes, but the, the real, the critical starting point of this whole, uh, of this whole case is March planning and zoning commission. Um, here. So we're, we're required that the housing authority is required to start the process of seeking the zoning change by submitting the request to the, uh, to the planning and zoning commission. At that time, there was vehement, uh, community opposition from the neighbors, um, and the, and the planning and zoning commission unanimously, um, rejected the, the request. And this is all in the record? This is all in the record. Okay. Go ahead. Um, the, so there, there are, to your, to your question, Your Honor, because it is a long, it's a long factual history. I would, a couple of things that I would note. That's right. Yeah. I mean, and you have plenty of time and if you need more time, we'll, we'll give it to you. Thank you, Your Honor. I just want to make sure that I'm, that I'm answering your question as, as directly as possible. And there are, so there, there was vehement community opposition. Um, not only were there, uh, with this large crowd show up at the planning and zoning commission to express their disapproval of this project. There are also letters, um, in the record from the community saying that we don't want this type of a, of a, of a, of a, uh, complex in this neighborhood. There's a family neighborhood things to that extent. And I, and I believe more directly to your question, Your Honor, there's evidence in the record of, um, of folks from the planning and zoning commission saying we're going to do what the, what the public, what the public said, we're, we're, we're going, we're going to go the way that, um, that the public is on this. And clearly the neighborhood, uh, was against this. But when you look throughout the whole, throughout the whole history, it's clear that, that it was never going to happen because even when they got to the point of it, it didn't require any zoning changes. We got down to the, to the, I believe the 16 unit was the first one that we could have done without any of the zoning changes because some of these lots, there's four lots and, and it was only two of the lots that were zoned single family. So I think there was a plan where the 16 unit wouldn't have required any zoning changes, but the response to that was, we're not going to issue the permitting. It gets down to 10 units responses. We're not going to issue the permitting. But the final response was we're only going to issue permitting for four single family houses on this property. Um, so I guess the answer to your question, your honor, is that the, the whole factual history of the case suggests that the city simply was not going to allow there to be a multifamily housing complex in that neighborhood. Uh, But your, your position is that, that, that your, your client was not, uh, still required to get a formal refusal or a form of failure to get it passed through the, through the commission, uh, through the, through the zoning commission and the city commission. That is the critical issue today. That, that, that, that is the issue in, uh, in the, in the court's order. The only issue that the court addressed was standing the district court. Um, and for precisely that reason, your honor, that because the city commission never took a vote on this issue, that there was, that we don't have standing. That's it's fairly traceable to the city of Port Isabel. But the problem is there's no way for us to make the city commission do that. We did exactly what we were required to do, which is initiate the process at the planning and zoning commission. There's nothing in the municipal regulations that say, well, if you get, uh, if you get voted down by the planning and zoning commission, that it's your obligation to then take that to the city commission, uh, because the city commission does have the opportunity to, to, uh, to accept or deny the planning and zoning commission's recommendation. That just, that's something that would happen in this case. I just want to make sure I understand when you were injured. So were you injured when you had to offer 16 units? What was the first one? Was it 24? The first 26, sorry. So when you went from 26 to 16, were you injured in an article three cents? I don't know. There are, I think there's an argument that, that we were, what would be the argument? I mean, if, if you, if you had been, they offer you 16, you know, you have to negotiate with them because your funding is conditional on getting a permit. So you go from 24 to 16 and they say, great, we're going to do a deal at 16 and it closes and everything's fine. Do you think you would have a, you could come to federal court and complain that it went from 26 to 16? I'm not, I'm not, I'm not saying that because I disbelieve you. I'm just, I want to, I don't understand the theory. So I'm hoping to hear it. If, if the, if the reasons for changing it from 26 to 16 were pretextual and racially driven, then I think it's possible that you could have a case that again, I'm, no, because it, when you, these cases are so fact intensive and particularly when you're, when you're at the end of the day discussing whether or not there was some sort of racial animus, they're, they're very fact intensive cases. And if it was, if we were, if we were promoting, if we were complying and trying to do the 16, you know, if we, if we had agreed and, and, and, and ultimately established the project, would we have had a traceable injury at that point? I'm just not sure. And the thing is, I'm not, I'm not trying to ask you about the racial discrimination thing, because obviously I don't want to talk about the merits. I'm just trying to understand the article three standing question. And simply as to whether you're injured, it strikes me that if you propose 16, you go to your third party lender and say, can I get funding for 16? The third party lender says, here's your funding for 16. And then you close the deal at 16. You have absolutely agreed to 16. And so regardless of whatever happened to get you to 16, you can't possibly be injured because you asked for it, right? You, you absolutely went into that deal, you know, eyes open asking for 16. The same would be true of 10. And the way I'm looking at these documents, the same is true of four. And so what I'm trying to figure out is where exactly does the injury in fact for article three purposes kick in? Well, when, when the funds go away entirely, if. On December one is when you get injured. So if they had come to you and said four units is good. And you had said, okay, great. And the third party lender had said, great, we're going to close on four. And you closed on November 30th. You wouldn't be injured. I think that's right. I think that's right, because we would have, we would have agreed to it. And we would have accepted it. So what would you say to the argument that the real but for cause here of the fact that the deal didn't go through was your clients repeated? I think it was more than once a failure to exercise due diligence to, to discover whatever legal restrictions there were. That, that, that that's not true with the, the. So legal restrictions in terms of the, the, the zoning ordinance. I was thinking mainly of the zoning ordinance. I mean, there was, there was lack of due diligence. Isn't that right? That's not really contested. Well, I would contest that judge there. Like I said, there, the project had been grandfathered in prior to the time that it was destroyed. If anything, going to the planning and zoning commission and, and seeking the variance under the then applicable ordinances, I would say it was belt and suspenders. I mean, at that point it had been vacant for a couple of years, and I think they wanted to go and clarify. I think it is clear from the record that they were taken by surprise by the, the opposition. There had, there had been a housing project there before there, they now had $1.7 million to, to redevelop it. The vehement opposition from the community, I think was, I think was unexpected. But after it was rejected that time, then the, the process, I mean, there, there was a, there was a nine month period after that initial rejection where the diligence was intense and it wasn't just my client. They partnered with the community development corporation of Brownsville, which is a nonprofit that has a very sterling reputation in these types of projects. Also the better block, which is a, an urban design architecture firm in Dallas. They partnered with these folks. Those folks started expending resources, engaging the community. I think it, I think they knew that if they, if they couldn't convince the neighborhood to allow this, that it wasn't going to happen because the city, the folks on the city commission and the planning and zoning commission had made it clear this neighborhood opposition continues. We're not going to let it happen. And so, but the diligence over, over those nine months, I don't believe that there was a lack of due diligence. Can I go back to your, can you hear me? Yes, your honor. Hi. Apologies for having to participate by telephone. I hope to be there in person with you next time. I want to go back to your, I think you were citing Lujan to support the notion that the traceability element is satisfied, not just by a complaint of act, but a complaint of omission. Correct. Your honor. Is Lujan your case for that proposition? Or is there another case? Yes, that, that's the, for, as, as far as standing generally, that's the, that is the case that it's, and that standard is, is in the court's order and in Applebee's briefing. Where is the omission concept there? I'm just helping out to find it. Cause I'm not, I'm at least not finding that word, although maybe I'm just not seeing it. So that, and I don't, I don't know that that's the, it's a concept in that case, but it's it's I I'm, I'm relying on that case is the, the Seminole case for the, for the standing for standard that, that would include omissions. So I guess what I'm wondering is I'm not necessarily opposed to any omission, you know, ever being actionable, but I'm wondering if there's a limiting principle here that we need to be guided by. Well, I, your honor, and to that regard, I would be guided by the, the Supreme court's decision and the, the Huntington case, which is, which is directly on point with this case where you had the failure to rezone gave rise to to a fair housing act. But of course, Huntington is not a standing case. Correct. Your honor. And I, I, I understand what I'm trying to understand in your response to judge Ho is injury. In fact, if someone injures you, we all understand that we see that every day. What we don't see is not acting somehow injuring you. You would need some sort of concomitant legal duty to do the thing you omitted to do. And I'm not sure I understand where that is in this case either. Well, in Huntington, they weren't addressing, they did not address standing. They did address exhaustion of a similar issue came up in that line of cases involving the exhaustion of, of, of remedies. And in fact, that's another area where the Huntington case is so critical because the, in that case, there was an issue made of the fact that there had not been a final determination by the town board. It was a, it was a resolution and the court, the court said everyone knew what was happening, that the plaintiff was trying to get the, the permitting and approvals to get this project completed and the municipality stood in the way and wouldn't let it happen. And then that's exactly what happened in this case. Is your theory that essentially, let's say the, the granting agency, I forget the acronym, the development council, let's say they had given you 25 years to get this done. In other words, there's really no deadline. Your theory, I take it is it didn't matter. The council, the city commission, what have you, they had made clear, they were just never going to let you move forward. Is that correct? Well, I think the, the, the deadline is very important because they knew everyone knew that, that this, that these funds were going to expire. So if they could sit back and wait and delay and you keep coming back and say, well, we'll change it. We'll make it smaller. You know, we'll accommodate this and that. Then eventually the funds are going to go away. Right. But the, the, obviously the deadline is not set by the commission. The deadline is set by the granting agency. I guess what I'm trying to get at is even if I, let's say I accept the hypothetical theory that a zoning agency that basically takes your application and puts it in their desk drawer, never to ever be seen again. Let's accept that that might be a standing in area. I'm not saying it is. I want to study that more, but let's say it is. What is your evidence that this particular zoning board was in fact doing that? Cause the facts that I'm seeing, and I want to give you the chance to address this is that you all weren't really putting the city to the question. Well, the, the, the way that we put the city to the question is by initiating it with the planning and zoning commission. And let, and let, and let me articulate your honor that I don't, that the city was never going to do this. I want to retract that statement. That's probably too broad of a statement. I think that what was clear was that as long as there was community opposition, the city was not going to allow this to happen. And during the time that I, that we would have been able to utilize these federal funds that the, the community maintained its opposition and the city did as well. Okay. Well, yeah, you do have five minutes of rebuttal. If there's anything else that you want to say on opening, you certainly may, but you have, we'll give you as much time on rebuttal as you, as you need. Okay. Thank you, judge. The only thing that I wanted to say, if I may, is that what, what is, this is undoubtedly a, a, a messy factual background in this case. But what is absolutely clear, what is undisputed in this case, is that the housing authority received a $1.7 million grant from the federal government. The housing authority initiated the request with the planning and zoning commission to change the zoning and redevelop this site. And as we sit here today, this site remains dilapidated and vacant providing no affordable housing to the folks of Cameron County, just as it has for over a decade now. And the $1.7 million has been directed elsewhere and that the housing authority lacks standing in this case to pursue its claims as a matter of law is incorrect. Thank you, Mr. Reamer. And you've, you've saved your time for rebuttal. Thank you. Mr. Aguilar. Thank you. Go ahead. Thank you very much. Our judicial assistants are doing a terrific job of helping us this week. Mr. Aguilar, let me tell you again how much we very much appreciate your efforts to be here in, in person. And it really does assist the court from both, from both of you. I've already said that, but I want to say it again to emphasize that the court really is, is indebted to both of you for your, for your help on this case. And also for your patience and waiting since March or April to have the case submitted. First of all, thank you. And it's my honor, Your Honor. Thank you for giving us the opportunity to present live, because I think in being able to present live, you get a better understanding of what actually happened. A lot of times the facts are not real clear. Judge Ho, are you able to hear okay now? Still? I am. Thank you. Okay. Good. That said, there's three real points I'd like to make. First of all, is that in establishing there's no article three standing because there is no case or controversy. There's no evidence that there was a final action by the city. There's no evidence that there was discrimination by the city through any final action. And third, that the statute of limitations had in fact expired. Before getting into that, I would like to give the court just a very short background of what actually happened. What happened was going way back to the beginning of the turn of the century, this particular building, which was owned by the CCH, I'm sorry, CHEDC, C-H-E-D-C, had started falling apart to the point where it was uninhabitable. The only people living there was I think one resident and a vagrant. Then came 2008, Hurricane Dolly. It pretty much demolished it. It was no longer habitable. Everybody had to move out. Under section 160.185 of the city's code, that section states that in the event of non-conforming use, previously this building had been used as housing, multifamily housing. Is that fact disputed? Because I thought I heard your friend on the other side say that it was. He did. He said that it was grandfathered in. And in fact, it was not. What I was trying to explain is what this section specifically says, is that in the event that the non-conforming use of any building or premises is discontinued or its normal operations stopped for a period of six months, the use of the same shall thereafter conform to the regulations of the district at which it is located. It had been grandfathered at one point, but once the vagrant and that one resident moved out and there was nobody living there, that grandfathering clause expired and now he had to comply with all the building codes. So then they got their, they got their, they applied for and got this funding of like one and a half million dollars to go build 16, I forget the number, 16 or 32 units on these lots. Now, in order to comply now with the city codes, in order to have, first they wanted 26 units. They would have had to have 52 parking spots off the street. And they would also have to met certain height, size, and setback requirements to comply with the code. They did not start doing anything for about two years. Then in March of 2015, pardon me, in March of 2015, they said, I'm going to submit this, this, this, this application. And the application says, I want to go to multifamily on this, this set of lots. One set to the, to the lots were residential and the two of us were multifamily. I want to make them all multifamily. So they said, I want to do that. And here's our application. They didn't say what they were going to do. They didn't say how they were going to meet those requirements. They didn't say how they were going to apply the code or how the code should be modified in any way. They said, here you go. Let's go have a hearing. So they go have a hearing. And at the hearing, a lot of residents, because we've got to notify the residents, the residents show up and say, whoa, whoa, whoa, whoa, what are you doing? All of a sudden you're going to have 36, I'm sorry, what is it? 26 different apartments. Have you considered what we're going to do? This is a narrow street. Where are they going to park? How big is this building going to be? What are they going to do to get to justify this modification to the city's building codes? And basically they provided nothing. They started meeting with different members of the P&Z, I'm sorry, the city staff. And the city staff, I think their role was to try to help them get to where they want to be. Kind of as Judge Oldman had mentioned, maybe you can't do this, but you can do that. If you get to the four units or 16 units or whatever the number may be that you have, you can meet the codes, you no longer have a claim. The city staff is trying to get them somewhere they can work, somewhere they can be with what they've got. If you've got limited space requirements and you don't have a plan on how you're going to accommodate that, you haven't shown why you should be entitled to it. So then they go to the hearing on March 11, 2015, a lot of residents are visibly upset, saying, hey, what's going on? You haven't told us how you're going to do this. Now, they want to make reference to racial characterization of those comments. But what the comments were is concerned about how they're going to accommodate all these people in this small area. When that one didn't work out, the P&Z board told them, you haven't shown us why we should recommend this, so we're not going to recommend it. Is it fair to say, based on what I'm hearing from you, the city is not going to approve a 26-unit complex? I can't say they're not, but I can't say how they can approve 26 units without appropriate explanation for how they will accommodate height, size, setback, parking, and other requirements that the code requires. So let's hypothesize a world in which there's just a clear city policy, it's in an ordinance. That easily reads, essentially, that 26 units is not going to be allowed for a parcel like this. But four or ten might be something that you'd be open to. Why is that a standing problem? I mean, I could see that you guys would have arguments about the merits, that this is not racist, it's a good zoning policy, etc., etc. But why are they not allowed to complain, at least from the standpoint of establishing standing, that as much as they would enjoy having four or ten units, they'd rather have 26? What you're really talking about is how they can do it and whether they can do it. For example, let's say instead of this, they wanted to have a 15-story building that would have 26 units, and now they have parking inside the building and it would all fit. The problem with that would be also that you've got certain height requirements so this one probably wouldn't fit in this area. But regardless of that, the standing issue has more to do with the fact that they have not identified an injury, in fact, by the city or any final action by the city or any discrimination by the city. And without those elements, without establishing those elements, they have not identified an injury that they have suffered. It has more to do with the other aspects. The facts I was just describing have more to do just with what actually happened. I just wanted to give the court some background. If I could get into those other issues, though. When they showed up, they had no development plans. They only had an idea for a project. And I told you about the code requirements that are entitled to provide certain restrictions on height, size, setback, and those sorts of things. But the most important part is that the plaintiffs never got to the point where they made a presentation or request, somehow presented or requested at the city commission considering. Now, one of the things that plaintiffs want to argue is that the normal process would have been that the P&Z commission recommends, it goes to the city commission, they say yay or nay or don't do anything. They want to say they're done as soon as they made their first request. And I don't think that's accurate. In other words, Ms. Cantac-Alcantara was the one who was the chair, and they asked her, what is it that happens? She said, well, my understanding is that it goes on up from there. She didn't really say this is the process. And for comparison, what I would ask the court to consider, for example, let's say a different type of situation. Instead of having this presentation to the P&Z board, instead of that, you have a guy walks in, a Hispanic guy walks into city hall, talks to the clerk up front, says, hey, I'd like to make a 26-unit subdivision. Here's my form. Here you go. And in my form, I'm saying this is what I want. The clerk looks at him and says, we don't lack Mexicans around here. And she sticks it in her drawer and ignores it. At that point, have they identified any discriminatory action by the city? The city is not responsible for every action of every clerk, of every employee within the city. Somehow you have to present it to the appropriate decision makers. I think the... The Lovat-Sternberg case, that's the one that applied to a village ordinance. That's one where they said you have to have a decision by the appropriate decision makers, not simply by somebody within the city. LNF Holmes is the one that talked about having a need to establish the city's discriminatory intent. Huntington Branch, which is the one they want to rely on primarily, is involved in a mix of discriminatory treatment and disparate impact. That was a 1988 case that talked about a town's refusal to rezone. That was an FHA case involved in standing. At the city hearing, there was comment regarding drugs, parking... So is this a Monell type point you're sort of making? It's kind of a... I agree Monell applies to Section 1983 cases and it hasn't formally been... But I thought we were here for standing. I'm not sure I'm... Let me back that up. It's like Monell, but I can't say it is Monell because Monell hasn't been specifically applied to FHA cases. And he's right, the opposing council is correct in saying that they haven't specifically said that. But if you look at every case that discussed the FHA and how it applied in those circumstances, every one of those cases were presented to the town council, the town board, the city commission, as I was talking about the... I'm sorry, LNF homes that talked about requiring a city's discriminatory intent. Huntington Beach was the mixed case, but in Huntington Beach, that was their refusal, the town council's refusal to rezone. Now, what happened was they presented it to the town council and the town council said no action taken. Well, that's... Sometimes no action is action, but they were presented with it and they seized the opportunity to present it. The city does not act through every one of its agents under Monell and the other Section 1983 jurisprudence. Yes, they do require deliberate indifference, they require a specific act of the official policymaker, etc. And we haven't had that here because there hasn't been a reason or a need for it. There hasn't been any case, any set of facts where somebody said prior to this, as far as I'm aware, that they are sufficient to establish standing. Right, but this one is not because nobody ever called the question. Is that the idea? Correct. And as he cited in Huntington Branch, that was a case where they presented it to the town council and the town council took no action. And the basis, to follow up on what he was saying, the basis for the town council's action was there were a lot of complaints about what sounded like racially tinged comments. And Huntington Branch said when you have the decision maker making a decision either by itself or through those to whom it is, I forget the term, responsible, I think, in those circumstances, yes, they could. But you have to present it to them first. Okay. Do I understand correctly the, what do you call it, the P&Z? P&Z. The P&Z doesn't have any authority, correct? They're just sort of an advisory body? Correct. They're only an advisory body. Okay. So it's the city, in other words, nobody can do anything based on the P&Z. You have to go to the city commission. Right. The P&Z is an intermediate decision. It's like saying the police chief or some other city official didn't let me move forward. Well, if you're going to criticize the city about that, you've got to have the city official. The city charter provides the city commission. Okay. So until the city commission does anything, nobody can build anything. Is that what you're saying? No, I don't say that. They cannot go against the city. For example, if now they wanted to file... I'm sorry. I'm going to get very precise. To get a variance, you have to go or a change in zoning, you need the commission. Did they ever go to the commission? No. And they never requested to. They made no effort to. And for perspective, I'd also add the P&Z member, they did not sue any building official, city building official. For example, let's say they want to say it's a 14th Amendment due process claim, something along those lines. They did not make that claim, saying that I want to go after that individual either in his individual or his official capacity. Official capacity, for example, to get an injunction or a declaratory instruction to make him go do what he's supposed to do, whatever that might be. That's a different case. But what we have is a case against a city. And the claims against a city, in order to pursue a claim against a city, you've got to have the city responsible, which only acts through the city commission. Now, moving on to the race issue or the discrimination issue. They also didn't identify any facts that would establish some action was taken because of race. I'd refer... I just want to clarify, they did sue the commission and the P&Z commission. Well, they sued... Those were dismissed on procedural grounds, but they did try. Pardon me. They did, but the city commission has no dual existence in itself. You cannot sue the city commission. You can sue the mayor to request declaratory relief or something, but you can't sue the city commission for a violation of the FHA. I'm not aware of any authority to do that. You have to sue the city, and if it's a city, you've got to sue... The city only acts through the commission. If I may continue on the race issue, I'd compare the court... I'd refer the court to L&F Holmes. That was one where there was a standing question where at a city hearing, there were comments regarding drugs, parking, and safety, but like the current case, they made no reference to race, and the court came back and said, there's no indication that just because you want to say, oh, it's all race-based, that it is. In other words, whenever people say, well, there's drugs, that does not mean it's race. I'm Hispanic. I get offended by that. Just because you say there's a bunch of Mexicans living there doesn't mean we're drug dealers. Just because there might be drug dealers doesn't mean they're Hispanic or any other race. There's no connection there, and that's what we're talking about. The Inclusive Communities Project case is also the one that said that you need to have some form of intentional discrimination. Not simply, I can interpret really what they meant was discrimination. You have to have some kind of intentional discrimination. The... Oh. What it appears they're trying to do, the plaintiffs are trying to do, is follow the post hoc ergo X caused Y. In other words, the fact that they were not able to get their permit obviously had to be because of race. Look, they didn't get their permit, and there's a bunch of Hispanics that live there. That logic doesn't really follow. It's an extension of the law. Can I clarify? You brought the Inclusive Communities Project case. We've talked this morning about Huntington. It's clear that the appellants think that Huntington is their best case. It's not obvious to me how this interacts with the standing question, right? Because Inclusive Communities Project obviously is not a standing question. Huntington is obviously not a standing question. These are cases on the merits about what one has to prove to show racial discrimination. In one case about disparate treatment, in the other case about disparate impact. I guess actually they're both about disparate impact. But neither of them go to whether the appellant or the housing authority  I have a little understanding, to argue it myself, the standing issue. But the way the courts have analyzed it is when you have not established a basis for action by the city and damages related directly attached to that action, you have not identified a case or controversy. And without a case or controversy, you have no standing to appear before the court. And that I understand. In other words, what I would normally file a motion to dismiss under 12b-6 or 12b-1 has not gotten there yet. And I think, best I can understand is that's the way the courts have analyzed it is there's no standing because you have not identified a case or controversy. I don't know if that makes sense to you. Well, I certainly understand the case or controversy requirement. What I'm not sure I understand is that it would strike me that, let me throw out a proposition and you can agree or disagree with it. If it were true that omissions were actionable in this circumstance, there would be an Article III injury in fact because the omission is the thing that's actually injuring the housing authority. The omission here being that. I think you'd still need to have what caused it. You can't sue for every omission by the City Council. Now, there's just because the City Council failed to do something. Oh, you know what? That reminds me, my cousin was there and I didn't like the way he sounded. Well, that's certainly true on the merits, right? You would need something on the merits to say, right. But that wouldn't be a jurisdictional question. That would be a... I went round and round on this because I've never argued one, a case where along this vein where I'm trying to say, you know, they have no basis in fact for the cause of action. They have no damages. So, I've never argued and therefore they have no standing. Usually I argue they have no standing because this particular person or this particular claimant didn't identify why they were the ones who were injured and that's it. But again, I'm not... I don't have a good answer for you. I'm just saying this is the way I saw it and it's the best I can interpret it. Well, maybe I can get at it this way. Do you think that our court without a cross appeal from the city could affirm summary judgment in this case on the basis, on the merits? That is, that there's no evidence of racial animus. Do you think we could do that? And would that not be a different form of a judgment than a dismissal for lack of saying? It might. I don't disagree that it would. In other words, you could say, I know what you considered, but really the way we're looking at it is really they just never established their claim and before even... even though they may... whether they may have gotten to the standing issue or not, which is unclear at this point  there's still the question of whether they ever established a claim, which is the same thing I've been arguing at step one. It's just kind of like arguing qualified immunity under Section 1983. Whether you say they violate a clearly established law or the law is clearly established, you can decide which one you want to take first and when you do, you don't have to consider the other. Whether this falls within that dichotomy, that difference, I'm sitting on this side of the bench. In any case, following up what I think they wanted to argue in terms of what we did, they want to argue discrimination on the basis of constructive or implied discrimination rather than actual discrimination and I think the courts clearly have all provided that you can only get... you can only get four as a court of claim. You can only get specific... you can only get a discrimination claim through specific action. Williamson County Regional Planning Commission at page 186 was a zoning taking case. Not an FHA, but it was a zoning taking case and what they said is that you can only establish a violation after a final decision. Whether the P&Z board took some action or didn't, you still got to go to that final decision by the city and that final decision by the city commission has to be based on some sort of actual discrimination. Whether it's because there's a case in here or I heard what you're saying, but no. They just have to consider it. You have to give them the opportunity to consider it. I'd refer the court also to Proprotnik which was a case that said you can't... subordinates' decisions do not establish policy by default.  I'd like to bring in if I still have a few minutes is the statute of limitations for the P&Z board meeting in March. You had a June issue where they wanted to talk to some city officials about how to make it work. The plaintiffs say that what the city manager said was you're going to embarrass yourself or something like that. What he was trying to tell her was she was not ready. What the city wanted to do was listen to every one of the comments, references to the city officials. They all wanted this project to work. They wanted to bring people in there but they had to be within the rules, the zoning rules that were already set by the city. They met with her. They tried figuring out how are you going to get this and she couldn't get anything. She said that he said I don't want you to go to city commission because it will be explosive. What he meant by that was you don't have answers yet and if you don't have answers they're going to run you out. So why do you want to go without answers? She could have said I want to go anyway and he would have sent her. She could have at any time, that was Daisy Florida's executive director, she could have at any time either that time, later on in August or September when they were talking again about the 16 units or even in November when she said they were talking about the four cottage units. She could have said I need you to go, I need you to get approval or not because my funding is going to run out in a week or two. She could have taken that action but she didn't. She never gave the city the opportunity to make a final decision. The last action that she took was in June, that the city took was in June at her bed, in her listening, using her argument. The last communication she really had with the city where the city said yes or no, the city manager at that point didn't recommend she do it and she withdrew. She withdrew her application. After that, there was no other application that had been submitted. After June was the last time any application was submitted. The lawsuit was filed more than two years later in November of 2017 and nothing else that the city did prior to that time is a basis for claims. At that point, her statute of limitations had already run. They did not file suit timely. Basically, that's all I had to present to the court. If the court has further questions for me, I'd be more than willing to try to respond but otherwise, we'd ask the court that the judgment of the district court be affirmed. Thank you, Mr. Aguilar. Mr. Reamer, you've saved time for rebuttal. Thank you, Your Honor. In rebuttal, I'd like to make a few points. On the point of whether the Huntington case and the ICP case are standing cases, they're not. However, they're highly analogous to this case, particularly the Huntington case. I would say that while the standing issue wasn't addressed, the plaintiff had standing in those cases to proceed with those claims. I'll read a quote from the Huntington case on this point. In sum, we find that the disproportionate harm to blacks and the segregative impact on the entire community resulting from the refusal to rezone create a strong prima facie showing of discriminatory effect far more than the Rizzo test would require. So the failure there to rezone is what caused the harm. Another point, well, before I move on, in support of the notion that the standard should be official action by the city commission, there's nothing anywhere in the record in anyone's brief. That would be a new standard. There's no support for that. So on that point, can I ask, I'm looking at the Daisy Flores declaration and most of the stuff that you talk about that the city has done wrong agreeing with the residents, et cetera, is from this March PNZ meeting where the comments were made. And then paragraph 10 says after hearing these comments from the public, the PNZ commission agreed that the apartment complex was not right for this neighborhood and unanimously rejected the rezoning and replatting requests. Could your client have sued then? Because as I understood your argument at the top half of this, it was that they were always going to roadblock us. The damages at that time I think weren't clear, your honor, because we still had access to the funding. We still, we had time. We had months to go and try and make this come to fruition. So you didn't have a claim in March? I don't think it was ripe at that time, your honor. What about June? I don't believe so. And not July? Really not until December 1? That's my, that's our position. On December 1, when the federal government says these funds are gone, our claim becomes fully ripe. And it, quickly, before I run out of time, there's a couple things I wanted to note. It seems like this standard may come from a conflation of section 1983 claims that require, that the statute expressly requires acting under color of law, and that statutory scheme is completely different. It's interpreted very narrowly. Case law regarding having standing under section 1983 and acting under color of law is much more difficult. And I want to read from the Woods-Drake v. Lundy case. This is a case from this court. The provisions of 40, this is discussing the broad and liberal construction that, of the Fair Housing Act. Why don't you give us that citation? Yes, certainly, Your Honor. It's 667 F. 2nd 1198 at 1201. It's the 1982 5th Circuit case. Okay. In keeping with Congress, the provisions of the Fair Housing Act are to be given broad and liberal construction. In keeping with Congress's intent in passing the Fair Housing Act, of replacing racially segregated housing with truly integrated and balanced living patterns. Most of what the opposing counsel was discussing as far as whether they had shown that they had their ducks in a row, whether it was going to meet the parking requirements, and so forth, those are all intensely factual questions for trial that do not go to the standing issue. I'm more than happy to address those issues. I have one question. I take it if the P&Z Commission had gone your way, would you be able to do anything? If the P&Z Commission had gone our way and... And approved the 26th? Presumably... Go ahead. Sorry. Well, I guess I'm trying to understand your question, Your Honor. Did you have to go to the City Commission for this to work? Then the City Commission has to affirm or deny it. Right. The P&Z Commission itself can't do anything. Do you agree with that? Yes. Okay. Did you... Opposing counsel said you never went to the City Commission to get a yea or nay answer on any of your requests. Is that true? Did you ever go to the Commission? That is true, Your Honor. We did not. And there is nothing that required us to do so. There is nothing in the... There is no process in the municipal regulations that say, well, if you get a bad result from P&Z, then it's your... The petitioner, it's your burden to then go over and request that the full City Commission reject that recommendation and, in fact, approve the project. But the actionable omission that you're referring to, I think, is the Commission's failure to rezone. That is absolutely one of the omissions, yes. And those omissions continued on for the next nine-month period. I mean, you get later on into the summer, and we don't even need the proposals that we're presenting at that time don't require rezoning, and we're having meetings with the City Manager and the Mayor and the Building Inspector who are saying, we're not going to grant the permits, and the District Court swept all that aside saying, well, that's just all hearsay and that's    all hearsay. So, if we had 15 and 10 unit plans, it wouldn't have required rezoning, it would have required permitting. They wouldn't even give us the permits to proceed with any multifamily. Feel free if there's anything else you'd like to say to wrap up, take whatever time you need. Thank you, Judge. I won't take up much more time. On the question of, again, wasn't Council talking much about the merits of the case and whether or not there's discrimination, whether or not there's discriminatory intent, whether or not the merits are there, what we believe are pretextual reasons for not doing this project, the parking and all those issues. We believe it supports our position in the record and even if the court were to look at it on the merits, the ruling should not be affirmed. Those are all questions for trial. But if there is to the question of whether or not there was discrimination, I do want to leave with one thing and that is the minutes from that first critical planning and zoning commission meeting, the minutes are the best evidence of where the feelings of the community were headed. When the official minutes said any members appeared and said they were going to propose the project based on the types of tenants that there were going to be section 8 folks. And there are other things as well. The disparate impact, it's well established in the record that 99% of the clientele of the housing authority are Latinos. So there would be a statistical disproportionate impact on Latinos. We believe that all of that is there and those are issues that should be decided by the fact finder. Thank you, Mr. Reamer, your case is under submission. Very interesting legal issues and you have been a member of the county housing authority for a couple of years, many years ago and three plus years as city attorney of Houston so I can sympathize with what both of you are interested with to represent your clients and the court appreciates your good briefing and your oral argument and with that, as I said, the case is under submission. We think this is fairly significant for our court because with the five cases that have been submitted on argument this week, as far as we know, this is the first federal court of appeals to have had face-to-face live merits arguments and we hope that it's a way that we can get back to our regular business and we're glad that you were able to participate. With that, the court is in recess.